# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-562 (RC)** |
| **BENJAMIN MARTIN** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court depart or vary upward from the applicable 18-24 month U.S. Sentencing Guidelines range to sentence Benjamin Martin to 30 months of incarceration, 36 months of supervised release, $2,000 in restitution, and a mandatory assessment of $170.

## I.    INTRODUCTION

The defendant, Benjamin Martin, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

In the weeks leading up to January 6, 2021, Martin equated the results of the presidential election to "the end of America." He declared that he was ready to go to war, civil war. A full month before Martin stormed the Capitol, the lines were already clear in his mind – either the results overturned, or he would go to war. As the certification proceeding approached, and an opportunity for his war presented itself, Martin told his friends and podcast listeners that he was going to D.C. on January 6 to stop the steal. Specifically, he went to fight against the certification of the 2020 election.

Martin tried to make good on his promise. Martin ignored many signs that he was not allowed on Capitol grounds and stormed the Capitol building. Once inside, he refused to leave, fully committed to fighting for his perceived side. Martin confirmed at trial that it was "pretty evident" that the rioters were not allowed in the building and that officers were trying to shut the doors. Even after a line of police officers physically pushed Martin out, Martin obstructed the police and prevented them from securing the door. Entrenched in his position, Martin refused to let go of the North door of the Capitol building as officers battled to get it closed. Martin continued to remain outside of the Capitol building and joined the mob of rioters who prevented the police from securing it. He reopened the North door again and remained on Capitol grounds for nearly two hours. While outside the North door, Martin repeatedly referred to the certification of the election to actions taken by an oppressive government and compared his actions to "1776."

_____

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Since January 6, 2021, Martin has consistently refused to take responsibility for his actions and instead has championed them, stating to the press that "[t]o some degree, I think it [the riot at the Capitol on January 6] was a healthy exercise because I think the government needs to know that the people who stood up, (are fed up about) the lack of representation." When informed that this was the first breach of the Capitol since the War of 1812, Martin said "Wow! They made history, didn't they?" Two months after January 6, Martin honored his behavior with a "1776" tattoo on his knuckles. Even after his trial, Martin has refused to take responsibility for his actions. In August 2024, Martin stated on a Twitter livestream to other January 6 defendants, "[w]e all know this whole thing is a scam" and claimed that police "instigated" the violence on January 6.

A 30-month sentence of incarceration reflects the gravity of Martin's conduct, particularly in light of his continued lack of remorse and his repeated attempts to obstruct police as they struggled to secure the Capitol building on January 6.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the statement of facts supporting the criminal complaint filed in this case, ECF No. 1, for a summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

**B.      Martin's Role in the January 6, 2021 Attack on the Capitol**

*Martin's Statements Before January 6*

Beginning as early as November 2020, Martin made it clear that he knew that Congress planned to meet at the U.S. Capitol to certify the 2020 election. In 2020 through 2021, Martin had a Facebook/Youtube live show to voice his opinion on various political topics – including the 2020 election. Martin talked extensively to his viewers about a stolen election, and described in detail the proceedings that were supposed to take place on January 6, 2021. [*See* Govt. Trial Exhibit 319C, 330C]. During his podcasts, he discussed different legal challenges to the election in both state and federal courts and the audits that needed to be performed in particular states. [*See* Govt. Trial Exhibit 317B]. He had a guest come onto his podcast to explain that Vice President Pence could send electoral votes back to the states to recertify the count. [*See* Govt. Trial Exhibit 330A 330C]. Martin had specific and detailed knowledge of the electoral process and certification that was set to take place on January 6, 2021.

As the certification approached, Martin's language and desperation to "stop the steal" became more dire. In one of his December 2020 episodes, Martin said, "if we don't stop the steal, if we don't do something now, we lose our country." [*See* Govt. Trial Exhibit 319D]. In his videos, Martin stated he was willing to "go to war." [*See* Govt. Trial Exhibit 317E]. On December 29, 2020, Martin announced on his show that he planned to travel to DC to "stop the steal." [*See* Govt. Trial Exhibit 330E].

Martin's campaign started well before his trip to the capital. Before going to Washington, D.C., Martin also took affirmative steps to join a group on Telegram: The California Patriots– DC Brigade (the "DC Brigade").  The DC Brigade, founded and organized by Russell Taylor and Alan

Hostetter, was intended to be a "group of fighters" from California who would travel to Washington, D.C. for January 6, 2021, collect weapons, and be prepared for violence on that day. [Trial Transcript, June 20, 2024, at 179-180; Govt. Trial Exhibit 602]. On January 1, 2021, Russell Taylor sent a message asking for individuals to identify their prior experience, specifically law enforcement or military. [Govt. Trial Exhibit 602]. Taylor also asked chat participants what types of weapons they would bring with them to the Capitol. *Id*. They further discussed other logistical information regarding a meeting location on the morning of January 6th. *Id*. When asked to join the Telegram group, Martin made clear that he was "not averse" to violence.



From: 1407525568 Ben Martin
I am not averse . There are 2 of us, My dad will be there. He is an amazing man and one of my very best friends. He is coming as an observer only. I am so excited to be a part of history. We fly from Fresno on the 5th and will be in DC by 6:30
1/3/2021 1:00:45 AM(UTC-8)

[Govt. Trial Exhibit 601].

Once Martin joined the DC Brigade telegram group, he messaged, "I'm so excited to be part of this group." *Id*.

*Martin's Conduct on January 6*

Martin traveled to Washington, D.C. on January 5, 2021 with his father. The next day, according to his own testimony, Martin went to the Ellipse to listen to former president Trump's speech. [Trial Tr., June 24, 2024, at 173]. While listening to the speeches that morning, Martin made efforts to meet up with other member of the DC Brigade telegram group. [Trial Tr., June 20, 2024, at 180-182, Govt. Trial Exhibits 604-606]. He sent multiple texts in the DC Brigade telegram group asking for other members' locations and asking about a spot to meet up. *Id*. He called Russell

Taylor in an effort to meet. [*See* Govt. Trial Exhibit 601]. After the speech, he and his father returned to their hotel. Martin then decided to walk to the U.S. Capitol. As he walked to Capitol grounds, some of his Facebook friends sent him messages that told that the Capitol had been "breached" and "stormed." [*See* Govt. Trial Exhibits 339, 340]. But Martin continued to go towards the U.S. Capitol.

Coming from the west, Martin reached the north lawn of the Capitol grounds. At approximately 3:01 p.m., Martin's phone location data reflected his entry into the restricted area. [*See* Defendant Trial Exhibits 2, 13]. Based on his path and CCTV footage, Martin walked past multiple layers of bike racks and snow fencing with "area closed" signs affixed to them. [*See* Govt. Trial Exhibits 102, 107B, 108, 109, 111].

As he walked past barriers, Martin saw the Capitol in chaos. Lt. Walton explained that the West side of the Capitol was "utter chaos". Lt. Walton further explained, "[i]t kind of seemed like what I would think a war zone would look like. I was met with a lot of explosions going off. I could smell chemical munitions in the air. There were large crowds of people at the base of the inaugural stage that were fighting with the police. The CDU lines -- CDU meaning civil disturbance units – were struggling to keep up with the crowd and hold them back and out of the restricted areas." [Trial Tr., June 20, 2024, at 62].

Martin walked from the North lawn to the North door a little after 3:00 p.m. There, Martin saw officers holding the North door opened and directing rioters out of the building in order to secure the building. [See Govt. Trial Exhibit 501, Defendant Exhibit 9]. At this time, there were multiple breaches in the building and officers were trying to clear rioters who had breached other areas of the building out of the North door. [*See* Defendant Trial Exhibit 9]. Video presented at

trial showed that the alarm was blaring. *Id.* Martin said to the officers as he tried to get into the building, "We just want to go inside." [*See* Govt. Trial Exhibit 501]. Moments later, Martin stood in front of the crowd, and he joined the mob in chanting "whose house, our house." *Id*. Martin told police officers they should "do the right thing," while he pointed to the door. *Id*. Martin asked officers multiple times if he was allowed in the building. The police never once told him that he was allowed in the building. [Trial Tr., June 24, 2024 at 197-198].

Martin breached the U.S. Capitol building at approximately 3:11 p.m. To enter, Martin pushed past an officer and entered the Capitol building through the North doors. The rioters behind him followed. Once inside the building, an officer immediately stopped Martin, but Martin ignored him, walked around the officer, and moved further into the Capitol building. [*See* Govt. Exhibit 103].

At this point in the day, Congress was supposed to be inside the building to certify the 2020 election, but they could not because of the breaches in the building. [Trial Tr. June 20, 2024, at 60]. At the North door, Officers shot chemical irritant into the crowd to try to push the rioters, including Martin, out of the building. Open-source video shows that some of the rioters exited the building, but Martin remained. Officers shouted, "get back." Martin conceded at trial that this made it, "pretty evident" rioters could not be in the building. [Trial Transcript, June 25, 2024 at 89]. Martin only left when an additional unit of officers, including Officer Moreland, arrived to help push the rioters out. At trial, Officer Moreland, one of the officers at the North door, explained that his unit was trying to shut the door to secure the Capitol building so the rioters could not reenter. [Trial Tr. June 21, 2024 at 5].

As officers pushed Martin out of the building, he grabbed the right-hand side of the North door, held it open, and then fought to hold the door open as multiple officers were trying to shut it. Despite their battle, Martin refused to let go. [*See* Govt. Trial Exhibit 501]. An officer swung a baton at Martin's hand five times, hitting him once on the hand. Still, Martin did not let go.  In a video Martin took, the same officer who originally stopped Martin said, repeatedly, "we're gonna shut the door. Martin replied, "no we're not." Martin's own video also shows him yelling, "this is what an oppressive government does" as he struggled with officers over the door. [*See* Govt. Trial Exhibit 351A]. Officer Moreland testified that the task of shutting the doors at this time was not easy because, ". . .  we had some people that were interfering with the doors so we couldn't close them." [Trial Tr. June 21, 2024, at 6].

Eventually, the police closed the North doors, but the rioters, including Martin, did not give up. Martin encouraged another rioter blocking the door saying, "That is really smart, putting the flag right there, I love that." [*See* Govt. Exhibit 501].

After members of the crowd shouted to open the North door, Martin walked toward the right-hand North door, which police officers had already resecured, and he grabbed the door to force it open. *Id*. Once Martin pulled the door open, the crowd cheered. *Id*. Martin admitted on the stand that, "it became very clear to me that they wanted to shut the door around the time they were pushing us out" – which occurred minutes before Martin opened the right North door. [Trial Tr., June 25, 2024, at 105, *see* Govt. Exhibit 501].

The struggle over the North door continued as officers tried to secure the door for over an hour. Officer Moreland testified that the entrance could not be secured because Martin and the mob would not stay back. [Trial Tr. June 21, 2024, at 17-18, 22, 23].

It was clear that Martin felt the effects of the chemical irritants when he exclaimed, "that's nasty stuff." [Trial Tr. June 25, 2024, at 106].  Martin repeatedly made his way to the front of the crowd. Meanwhile, rioters sprayed officers with chemical irritants and objects. They fended off these rioters by physically pushing into them.

Martin stood by for another hour and yelled at officers:

- At 3:36pm: "We demand action guys, how about you fight with us, how about you turn around and if your brothers don't let us in you pepper spray your brothers. How about you guys recognize that we're here to solve a problem. That problem is an oppressive government." [Govt. Trial Exhibit 204].

- At 3:45pm: "And this is what's going to happen we're going to rise up against an oppressive government and that's what we have to do. There's no longer representation [] in this country just like 1776 when Great Britain was oppressing the colonies of America they had to fight back because they didn't have representation." [Govt. Trial Exhibit 203].

- At 3:46pm: "We just want to get into the house here and make a statement and show the country what's going on because guess what its wrong. And instead of saying you know what it is wrong and we recognize that the government has gotten too big and its too tyrannical we're gonna do the right thing and we're gonna stand down. The people have a voice. The voice of the people needs to be heard." *Id*.

After about an hour and a half, at approximately 4:30 p.m., a line of new officers came in to push the rioters away from the door and to relieve the posted officers.  After over an hour and half at the North door, repeatedly struggling with officers, Martin left Capitol grounds. As he left, he told another rioter, "it's a civil war, it's a civil war . . .  it's time." [Govt. Trial Exhibit 507].

### *Martin's Statements and Actions After Leaving the Capitol*

At the airport, on his way home from Washington, D.C., Martin continued to express his objection to the certification of the 2020 Election. While in the terminal, Martin approached Senator Lindsey Graham, who voted to certify the election, and called him a traitor. [Govt. Trial Exhibit 364A].

On January 8, 2021, Martin also discussed his time on Capitol grounds with local news outlet, GV Wire. Martin told the news outlet that he was in Washington to support the president, that he tried to act as a peacemaker, and that Antifa was to blame for the building's breach and vandalism. [Sentencing Exhibit 1]. He further told the news outlet that Martin insisted that much of the protest was peaceful, ruined only by some "bad apples." The news outlet reported that Martin said:

- "I was trying to negotiate with both sides to de-escalate the issue"
- "I was literally in the middle of the front door when the herd behind me — there were thousands of them. All this weight of people starts moving you in a direction, I couldn't control the direction of anything at that point."

*Id*.

The news outlet reported that once inside, Martin said that he continued to urge people to leave. He believed he was about 10 to 15 feet inside the building before peacefully walking out, avoiding the pepper spray. He said, "This is way too out of control. I'm one person and I can't help anymore." *Id*.

Martin said, "To some degree, I think it was a healthy exercise because I think the government needs to know that the people who stood up, (are fed up about) the lack of representation.". The news outlet stated that when informed that this was the first breach of the Capitol since the War of 1812, Martin said "Wow! They made history, didn't they?" *Id*.

By at least February 2021, Martin also permanently commemorated his time trespassing and engaging in civil disorder by getting a "1776" tattoo. [*See* Govt. Trial Exhibit 210, Trial Tr. June 24, 2024, at 63-65].

*Martin's January 15, 2021 Interview with the FBI*

On January 15, 2021 the FBI conducted a telephonic interview with Martin about his conduct on January 6, 2021. He told the FBI that he saw people climbing the Capitol building walls with ropes. [Trial Tr. June 24, 2024, at 122]. Martin also told the FBI that, "the steps [on the west side] on the front had too many people on them so he made his way around to the north side." [Trial Tr. June 21, 2024, at 126].

*Martin's False Statements at Trial*

Martin chose to testify at trial; however, his testimony was untruthful as the government's case in chief directly contradicted it and the jury, by convicting him, decided not to credit certain critical pieces of his testimony. For instance:

- **Martin testified falsely at trial about not seeing "Area Closed" signs and restricted perimeter fencing**. "Q: Did you see any barriers A: I did not notice any barriers. Q: Did you see any signs telling you don't enter? A: I did not." (Trial Tr. June 24, 2024, at 183). "I did not see any signs advising me that I'm not allowed on the grounds. . . There was nothing indicating that I was breaking the law." *Id*. at 187. "I didn't see a sign saying "don't enter" or anything to that effect." *Id*. at 192.

- **Martin testified falsely at trial that he believed he was allowed into the capitol building and that the officer at the door tapped him on the back to tell him he was allowed in.** "At the time, I believed that I had a First Amendment right to go in and report in a public building. So my belief was that upholding the Constitution would be allowing me to go in and practice and exercise, I should say, my right of the First Amendment, which is freedom of the press, other things as well, but that's what I was referring to." *Id*. at 199. "So at that time, as you saw in the video, I didn't realize it, but a lot of people were gathering behind me. And it appeared -- it felt like he was saying hurry along, there is people trying to come through behind you. I thought it was like a hurry up type of a tap." [Trial Tr. June 25, 2024, at 10].

- **Martin testified falsely at trial that the police instructed him to stay in the Capitol building so that they could escort him out.** "He told me that we were going to have to leave. I said, 'No problem.' There is a ton of people at this point pouring in behind me. I said, 'How would you like me to do that?' Q: And what did he give you instruction to do? A: At that point, he told me to stand against the wall and to wait for him to come back and he would be escorting me out." *Id*. at 12. So

11

that is the original officer who I spoke to who told me to stand against the wall, who also told me that he would be back to escort me out. He was coming back to fulfill what he told me he would do. *Id*. at 18.

- **Martin testified falsely that the reason he held open the door was to protect the people getting forced out and to protect the officers, since there was debris in the doorway.** "I get forced to the door and I see all of these people on the ground and all of this stuff happening, and I figured the best thing I could do was to keep the door open so people wouldn't get injured by the door." *Id*. at 23. "The officer couldn't see that there was debris on the ground preventing the door from closing, and what I was trying to say was we're not able to, no, we're not able to, but, unfortunately, things were going so fast, I mean it was too hard to communicate. I wasn't thinking clearly, but it wasn't able to shut because there was debris on the ground." *Id*. at 26.

- **Martin also testified falsely when he stated that he re-opened the door after being hit with a police baton because he was trying to protect the door from other rioters who were trying to break it.** "So the reason that I opened the door was the guy in the black hat, the black beanie that we just saw, and another guy had physically ripped open the other door and broke it. They didn't just break it, they said, 'If you close it again, we're going to rip it off the hinges.' My purpose for opening the door was so that they didn't rip it off the hinges." *Id*. at 29.

### *Martin's Post-Trial Statements*

After the conclusion of trial, Martin has continued to discuss this case and the events of January 6, 2021. Martin has continued to double down on his false allegations and, blames police for instigating the violence he participated in.

In an August 19, 2024 Twitter livestream, Martin demonstrated his lack of remorse when discussing his actions on January 6.[2] Martin praised another January 6 defendant for "calling out the DOJ, calling out the prosecutors on their BS." He continued, "we all know this whole thing is

---

[2] https://x.com/FreeStateWill/status/1825668811917500762

a scam, I really have to be careful with what I say because I still have my sentencing coming up on November 15, which is after the election, which is fantastic."

He stated, "in the area that I was, it was, the police officers, it was the capitol police, it was metro who instigated the violence in the area that I was in. Fortunately, I didn't take part in any of it, but due to the rain drop theory . . . I was also convicted of civil disorder" and "the defense I wanted, was to highlight the aggression of the Capitol police."

When discussing the jury selection process in this Court, Martin warned, "it's wrong, it's a joke." In their conversation, the other January 6 defendant stated that he intends to keep punishing the government by filing multiple motions and Martin responded, "I love that."

## III.    THE CHARGES

On June 26, 2024, following a jury trial, a jury returned verdicts of guilty on all Counts of the Superseding Indictment (ECF No. 22) against Defendant Benjamin Martin ("Martin") (*See* ECF No. 90):

Count 1:      Civil Disorder, in violation of 18 U.S.C. § 231(a)(3);

Count 2:      Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2);

Count 3:      Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1);

Count 4:      Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2);

Count 5:      Disorderly Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D); and

Count 6:      Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

The government subsequently dismissed Count Two of the superseding indictment.

13

## IV.    STATUTORY PENALTIES

Martin now faces sentencing on the Counts One, Three, Four, Five, and Six. As noted by the Presentence Report issued by the U.S. Probation Office, the defendant faces the following maximum penalties for his offenses of conviction:

- Count One (18 U.S.C. § 231(a)(3)): Up to 5 years of imprisonment, a term of supervised release of not more than three years, a term of probation of not less than one but not more than 5 years; a fine up to $250,000, restitution, and a mandatory special assessment of $100;

- Counts Three & Four (18 U.S.C. §§ 1752(a)(1) and (2)): For each count, up to one year of imprisonment, a term of supervised release of not more than one year, a term of probation of not more than 5 years; a fine up to $100,000, restitution, and a mandatory special assessment of $25; and

- Counts Five & Six (40 U.S.C. §§ 5104(e)(2)(D) and (G)): For each count, up to 6 months of imprisonment, a term of probation of not more than 5 years; a fine up to $5,000, restitution, and a mandatory special assessment of $10.

## VI.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id.* at 49. "As a matter of administration and to secure nationwide

consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.*

The government agrees with the draft PSR's Sentencing Guidelines calculations.

Count One: 18 U.S.C. § 231(a)(3)

| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | Adjusted Offense Level | 12 |

Count Three: 18 U.S.C. § 1752(a)(1)

| U.S.S.G. § 2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| U.S.S.G. § 2B2.3(b)(1)(A) | Restricted Grounds | +2 |
| | Adjusted Offense Level | 8 |

Count Four: 18 U.S.C. § 1752(a)(2)

| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | Adjusted Offense Level | 12 |

*Obstruction Enhancement under § 3C1.1*

Martin's false trial testimony should result in a two-point enhancement under U.S.S.G. § 3C1.1. Application Notes 4(B) and 4(F) to Section 3C1.1 state that "committing . . . . perjury" is one type of conduct to which the two-level obstruction enhancement applies, as is "providing materially false information to a judge." *United States v. Dunnigan*, 507 U.S. 87, 92-95 (1993). Whether Martin committed either type of conduct must be shown by preponderance of the evidence.[3] *See United States v. Smith*, 374 F.3d 1240, 1245 (D.C. Cir. 2004) (citing *United States*

---

[3] "At one time," the D.C. Circuit required proof of perjury for 3C1.1 purposes by clear-and-convincing evidence. *United States v. Makki*, 47 F. Supp. 2d 25, 29 n.3 (D.D.C. 1999) (citing

*v. McCoy*, 242 F.3d 399, 407 n.14 (D.C. Cir. 2001)). The Court should make specific findings at sentencing as to each element of perjury: that Martin gave "false testimony concerning a material matter with the willful intent to provide false testimony." *Dunnigan*, 507 U.S. at 94.

Martin testified at trial and repeatedly lied. As noted above, he made at least the following materially false statements:

- Martin testified at trial that he spoke to an officer inside the Capitol building who told him to "stand against the wall" and that he "would be back to escort me [Martin] out." [Trial Transcript, June 25, 2024, at 18][4]. Video evidence at trial showed that Martin walked past an officer who was holding his hands up to stop Martin from progressing further into the building. Video evidence further showed that Martin remained inside of the building even he saw officers deploy chemical irritants and after other rioters exited the building.

- Martin testified that the reason he held the left-hand North door open as officers tried to secure it was so that "people wouldn't get injured by the door." *Id*. at 23. He also testified that he kept the door open to help officers because the door "wasn't able to shut because there was debris on the ground." *Id*. at 26. This was false. Video evidence showed Martin physically grappled with the officers to force the door open while there was no debris in the doorway to block officers or prevent the door from closing. Although the Court provided the jury with a "Defense of Others" instruction that applied specifically to Martin's testimony that he held open the left-hand door of the North Doors to the United States Capitol. The jury's verdict showed that it rejected Martin's testimony that he acted in defense of the rioters or officers when he held open the left-hand door. [ECF No. 87 at 45]

---

*United States v. Montague*, 40 F.3d 1251, 1253 (D.C. Cir. 1994)). But the D.C. Circuit subsequently interpreted a 1997 amendment to the sentencing guidelines to mean that "such allegations could now be proven by a preponderance of the evidence." *United States v. Smith*, 374 F.3d 1240, 1245 (D.C. Cir. 2004) (citing *United States v. McCoy*, 242 F.3d 399, 407 n.14 (D.C. Cir. 2001)). While *Montague* has not, to the government's knowledge, been expressly overruled, the government is not aware of it having been cited favorably in a perjury 3C1.1 case that involved the post-1997 guidelines. Of course, Martin committed perjury under either standard of proof.

[4] Officer R.T. provided counsel with an email description regarding his interaction with Martin as he entered the Capitol building. Officer R.T. wrote that he remembers "clearly stating they could not be there and needed to leave, as well as informing them [rioters] that the Capitol was closed and there could be a variety of charges including trespassing and unlawful entry." He further wrote that "repeated attempts to convince them to leave the Capitol immediately, the individuals pictured lead the entire group (by their being in front and verbally encouraging the group behind them) past me and walked further into the inside of the Capitol Building ignoring my instructions, which I still continued to repeat." [Sentencing Exhibit 2].

- Martin testified that the reason he opened the right-hand door to the Capitol building after officers secured it was to protect the door. He testified, "the reason that I opened the door was the guy in the black hat, the black beanie that we just saw, and another guy had physically ripped open the other door and broke it. They didn't just break it, they said, 'If you close it again, we're going to rip it off the hinges.' My purpose for opening the door was so that they didn't rip it off the hinges." *Id*. at 29. Video evidence showed that Martin opened the right-hand door to assist other members of the riot get into the Capitol building. Moments before forcing the right-hand door open, Martin commended another rioter for using a flag to keep the left-hand door open. Additionally, the Court provided the jury with a "Necessity" instruction that applied specifically to Martin's testimony that he acted out of necessity when he opened the right-hand door of the North doors to the United States Capitol. [ECF No. 87 at 46]. Given the jury's ultimate verdict, the jury rejected Martin's testimony that he acted out of necessity to protect the door when he opened the right-hand door.

- Martin testified at trial that he did not see the "Area Closed" signs and fences that marked the restricted Capitol perimeter despite Video evidence showing that he walked by numerous "Area Closed" signs, bike fences, and snow fencing. [Tr. Tran. June 24, 2024 at 189-192].

The jury's verdict confirms the falsity of Martin's claims. Thus, the two-point enhancement applies.

*Grouping*

The government agrees with the draft PSR's grouping analysis. Under U.S.S.G. § 3D1.2, counts "involving substantially the same harm shall be grouped together into a single Group," including "[w]hen counts involve the same victim and the same act or transaction…"

Group One consists of Count One, charging Civil Disorder in violation of 18 U.S.C. 231(a)(3). This offense relates to Martin's obstructive conduct with United States Capitol Police officers attempting to quell a civil disorder, and includes when Martin held the North door of the Capitol building open when officers were attempting to secure it, as well as reopening the door after officers secured the door. The offense level for Group One is 12.

Group Two consists of the offenses charged in Counts Three and Four, 18 U.S.C. § 1752(a)(1) and (2). The victim of those charges is the United States Congress. The offense level for Group Two is 12.

Pursuant to U.S.S.G. §3D1.4(a), "Count as one Unit the Group with the highest offense level. Count one additional Unit for each Group that is equally serious or from 1 to 4 levels less serious." Here, that calculation yields two units total for Groups One and Two, which each had a Total Offense Level of 12. This yields a Combined Adjusted Offense Level of 14.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. The PSR correctly concludes that Section 4C1.1 does not apply in this case, PSR ¶ 70, because Martin has three criminal history points.

The U.S. Probation Office calculated the defendant's criminal history as category II, which is not disputed. PSR ¶ 82. Accordingly, based on the government's calculation of the defendant's total adjusted offense level at 14, and a criminal history category II, Martin's Sentencing Guidelines range is 18 to 24 months of incarceration.

## A.  Upward Departure or Variance

After determining the defendant's guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Martin's conduct warrants an upward departure of 6 months from the guidelines range of 18-24 months of incarceration because he engaged in conduct on January 6 to stop congress to certify the 2020 election.

Following *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024) the enhancements under U.S.S.G. §§ 2J1.2(b)(2) no longer applies. But that decision does not undercut the severity of Martin's crime – that, to obstruct the electoral certification, he positioned himself at the front of the mob in multiple instances and tried to overpower the outnumbered police force standing between him and Congress. And Martin's goal was no less than stopping the peaceful transfer of power; a goal that he and the mob succeeded in achieving for several hours, causing the evacuation of the entire Congress and the Vice President. *See Brock*, 94 F.4th at 59 ("interference with one stage of the electoral college vote-counting process . . . no doubt endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work"). In order to impose a just and fair sentence in this case, the Court should either (1) impose an upward departure pursuant to U.S.S.G. § 5K2.7, resulting in a sentence of 30 months' imprisonment– the middle of the guidelines range pre-*Brock*, or (2) vary upwards to sentence Martin to 30 months' imprisonment, above his current Guidelines range but still within the pre-*Brock* Guidelines range.[5]

A "district court's authority to impose a departure emanates from 18 U.S.C. § 3553(b)(1) and, in turn, in Chapter 5, Part K of the Guidelines." *United States v. Jacobs*, 635 F.3d 778, 781–82 (5th Cir. 2011). The Guidelines expressly state that an upward departure is warranted where a case presents a circumstance that "may not have been adequately taken into consideration in determining the applicable guideline range" or that "the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." U.S.S.G. § 5K2.0(a)(2).

---

[5] The government's proposed 30 month sentence is in the middle of what Martin's guidelines range would have been pre-*Brock* if Martin had received the +3 enhancements for obstruction causing a substantial interference under 2J1.2(b)(2).

One such circumstance is when an offense results in "a significant disruption of a governmental function." U.S.S.G. § 5K2.7.[6] The Guidelines also provide that a departure is warranted when an offense results in "a significant disruption of a governmental function" and the Guidelines do not reflect the appropriate punishment for the offense. U.S.S.G. § 5K2.7.   In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected."

Although the general rule is that § 5K2.7 does not provide for an upward departure when the offense involves obstruction of justice, the obstruction of the Electoral College certification on January 6, 2021 is the exact type of unusual circumstance that the Sentencing Commission could not have predicted and that warrants an upward departure. Those who obstructed the administration of justice that day targeted the peaceful transfer of power, one of the fundamental and foundational principles of our democracy. They were part of a mob that injured more than one hundred police officers and resulted in more than 2.9 million dollars in losses. Defendants like Martin "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *Brock*, 2024 WL 875795, at *15. It was an unprecedented day in American history. At least one Judge in this District has already applied § 5K2.7 in a January 6 case. *See United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and

---

[6] This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence." *See United States v. Saani*, 650 F.3d 761, 765–66, 771 (D.C. Cir. 2011).

aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours").

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges in this District have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducing the peaceful transfer of power. "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent. Tr., at 67. But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime.

- "He just wanted to delay the certification. He wanted the election certification stopped. That's chilling to me. I mean, that is not a minor thing, in that through -- through acts of violence and intimidation, we're going to stop the most sacred day in our democracy from occurring, which is the certification of the election, because we want some more time to try and make our case because the dozens and dozens of courts that have considered the issue and have concluded there was not a problem with the election weren't enough, and because I want someone else to take another look at this. And so, therefore, I'm going to go down to the Capitol and I'm going to stop the certification of the election from occurring. So I think that the offense here, to my mind, is one of enormous gravity." *United States v. Wyatt*, 23-CR-215-RDM, Sent. Tr. at 44.

- "The security breach forced lawmakers to hide inside the House gallery until they could be evacuated to undisclosed locations. In short, the rioters' actions threatened the peaceful transfer of power, a direct attack on our nation's democracy." *United States v. Fitzsimons*, 21-CR-158-RC, Sent. Tr., at 85-86.

Indeed, even before *Fischer*, judges in this District gave significant upward departures and/or variances in January 6 cases when they found the advisory guideline range inadequate. *See, e.g.*, *United States v. Hale-Cusanelli*, 21-CR-37-TNM, 9/22/22 Sent. Tr.; *United States v. Christian Secor*, 21-CR-157-TNM, 10/19/22 Sent. Tr.; *United States v. Hunter and Kevin Seefried*, 21-CR-287-TNM. 10/24/22 Sent. Tr.; *United States v. William Watson*, 21-CR-513-RBW, 3/9/23 Sent. Tr.; *United States v. Riley Williams*, 21-CR-618-ABJ, 3/23/23 Sent. Tr.; *United States v. Hatchet Speed*, 22-CR-244-TNM, 5/8/23 Sent. Tr.

Indeed, several judges in this District have upwardly departed in January 6 cases precisely because in a post-*Fischer* world, the advisory guideline range did not adequately take into account all of the relevant circumstances. *See United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours"); *United States v. Black*, 21-CR-127-ABJ, Sent. Tr. 5/16/23 at 27 (applying an upward departure pursuant to § 5K2.7 for a January 6 rioter).

In *United States v. Sparks*, 21-CR-87-TJK, Judge Kelly sentenced a defendant convicted of violating both 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 231. Prior to sentencing, in light of the Supreme Court's *Fischer* decision, the government moved to dismiss the § 1512(c)(2) count, and at sentencing, Sparks faced an advisory guideline range of 15-21 months. Judge Kelly found it meaningful that, despite the dismissal of the § 1512(c)(2) count, the defendant's conduct still included "an intent to obstruct or interfere with that proceeding, that important constitutional proceeding" which the court found to be "pretty dark behavior" which "posed a threat to whether

22

our constitutional process will proceed or whether a mob would interfere with that process." *Sparks* Sentencing Tr., at 87-88. Judge Kelly found that the "typical person convicted of [18 U.S.C. § 231] engaged in nothing at all like the attack on the Capitol and the certification." *Id.* at 94-95. Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. And not any proceeding, but one foundational to our country's governance." *Id.* at 93. Judge Kelly found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id.* at 94. Accordingly, Judge Kelly found a significant upward departure was warranted under both U.S.S.G. §§ 5K2.7 and § 5K2.21, and in the alternative a variance of equal amount was warranted under the § 3553(a) factors, and sentenced Sparks to 53 months of imprisonment.

Similarly, in *United States v. Robertson*, 21-CR-34-CRC, Judge Cooper resentenced a defendant after dismissal of a § 1512(c)(2) conviction post-*Fischer*. Without that conviction, the court determined that a new advisory guideline range of 37 to 46 months applied. *See Robertson* Sent. Tr., at 59. But the court also found that an upward departure was appropriate pursuant to U.S.S.G. § 5K2.7, because Robertson's conduct "resulted in a significant disruption of a governmental function, namely halting of the certification . . . and that is so regardless of whether Section 1512(c) applies." *Id.* at 61. The court also found an upward departure appropriate under U.S.S.G. § 5K2.0 because Robertson's conduct was "more harmful or egregious than the typical case represented by the otherwise applicable guideline range." *Id.* After considering the § 3553(a)

factors, Judge Cooper sentenced Robertson to 72 months of imprisonment.

Likewise, in *United States v. Dunfee*, 23-CR-36-RBW, Judge Walton sentenced a defendant on a § 231 conviction and a misdemeanor, after his § 1512(c)(2) conviction was dismissed in light of *Fischer*. Judge Walton found an upward departure was warranted under U.S.S.G. § 5K2.7, because Dunfee's actions contributed to and resulted in a significant disruption of the certification of the electoral college vote. Moreover, noting that "the Sentencing Commission did not contemplate the circumstances that occurred on January 6," the court also found that a departure was warranted under U.S.S.G. § 5K2.0(a)(2) because Dunfee's criminal conduct related to "the attempt by a large number of individuals, including the defendant, to stop the peaceful transfer of power." *See United States v. Dunfee*, 23-CR-36-RBW, ECF No. 90, at 2. From a guideline range of 18-24 months, the court sentenced Dunfee to 30 months of imprisonment.

Most recently, in *United States v. Oliveras*, 21-CR-738-BAH, Judge Howell sentenced a defendant on a § 231(a)(3) conviction, a § 111(a)(1) conviction, and four misdemeanors, after his § 1512(c)(2) conviction was dismissed in light of *Fischer*. Judge Howell found an upward departure was warranted under U.S.S.G. § 5K2.7 (Disruption of Governmental Function) because

> after *Fischer*, with the dismissal of [the defendant's] 1512(c)(2) conviction, none of the conduct that goes into determining defendant's sentencing guidelines reflect his intent to engage in political violence that poses such a threat to our American democracy… His intent to obstruct Congress in the Electoral College certification by violence, if necessary, go above and beyond what any of his current convictions now take into account.

*Oliveras*, 21-cr-738 (BAH), Sent. Tr. at p. 49. The court noted that "[i]n assessing the extent of the departure, review of how the guidelines for obstruction of an official proceeding at [U.S.S.G. §] 2J1.2 would have applied to defendant [pre-*Brock*] provide a general guide… [and] an upward

departure within that range is appropriate." *Id.* at 49-50. The court also noted that it "would impose the same sentence with . . . an upward variance for the same reasons that are outlined in § 5K2.7 and consideration of the 3553(a) factors." *Id.* at 97. From an advisory Guidelines range of 37-46 months' imprisonment, the court sentenced Oliveras to 60 months of imprisonment.

Because the seriousness of defendant's crime is not adequately captured by the applicable Guideline, an upward departure is appropriate here as well. If the Court declines to depart, an upward variance is warranted. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up). While the Supreme Court's decision in *Fischer* has changed defendant's advisory Guideline range, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, Sent. Tr. at 4-5 (cleaned up). Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95. *See also United States v. Kelly*, 21-CR-708-RCL, ECF 151, Sent. Tr. at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance

of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.")

In the specific facts and circumstances of Martin's case, an upward variance to 30 months' incarceration is appropriate. *See United States v. Reffitt,* 21-cr-87 (DLF), Mem. Op. and Order 4/10/24 at 10-11 (upward variance would be justified because "as other judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'); *United States v. Fonticoba,* 21-cr-368 (TJK), Sent'g Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *Fonticoba,* 4/11/2024 Mem. Order at 4-5 (denying motion for release pending appeal and agreeing that certification proceeding was "far more important" than "any run-of-the-mill" judicial or quasi-judicial proceeding). Accordingly, the government requests that the Court vary upwards and sentence Martin to 30 months' imprisonment, in order to give effect to "the concerns underlying the Government's requests for these enhancements under the § 3553(a) factors at sentencing." *See United States v. Seefried*, 639 F. Supp. 3d 8, 20 (D.D.C. 2022).

VII.    **SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)**

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Martin's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Martin actively participated in the riot, joined the mob to violently obstruct the police from securing the Capitol building doors, and resisted police attempts to clear Capitol grounds. Martin's intent was clear: to prevent Congress from certifying the election results. The nature and circumstances of Martin's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 30 months' incarceration.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, Martin has multiple past criminal convictions that demonstrate his willingness to be violent and his disregard for the law. PSR ¶ 73-79. Notably, Martin pled to obstruction of a public officer in 2003, pled to a 2016 battery charge where he repeatedly struck his 14-year-old daughter, and a 2021 battery charge where Martin choked his girlfriend and dragged her back into the house after she tried to flee. *Id*. Martin was on supervision stemming from his 2021 conviction while he committed the crimes in this case. PSR ¶ 78. Additionally, during the execution of a search warrant issued in this case, the FBI found eight firearms, including an AR-15-style rifle, multiple high-capacity magazines for the AR-15, and more than 500 rounds of ammunition. Martin was prohibited from possessing these items because of his prior domestic violence conviction, and he was charged and ultimately convicted of violating 18 U.S.C. §§ 922(g). On November 25, 2024, Martin was sentenced to 38 months imprisonment. *United States v. Benjamin Martin*, 1:21-cr-228 (JLT).

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the January 6th riot. *See United States v. Cronin*, 22-cr-233 (ABJ), Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.") Martin's criminal conduct on January 6 and his words and actions after January 6 and his trial are the epitome of disrespect for the law.

### C.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence therefore weigh strongly in favor of incarceration.

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs especially heavily in favor of a lengthy term of incarceration. Martin epitomizes disrespect for the law and disrespect for our constitutional order and has shown that he is willing to resort to violence when he does not get what he wants. Lengthy sentences are warranted to ensure that they understand that they have committed serious crimes that come with consequences, and in order to deter conduct like this again in the future.

First, Martin's lack of remorse for his actions and his public statements to that effect even after being convicted at trial strongly suggest that, given the chance, Martin would engage in similar criminal conduct in the future because he does not think what he did was wrong. Martin continues to blame everyone but himself for his actions on January 6. At trial, he blamed the police officers for not responding to him when he asked to go in the building, he blamed the police for shooting pepper balls at him and his fellow rioters without warning, and he blamed the FBI for showing up to his house "unannounced and without an appointment" [Trial Tr., June 25, 2024 at 48]. Even after trial, he blamed the police for instigating violence, he blamed the government, and he blamed this Court's processes and offended its ability to carry out justice.

Second, Martin's general disrespect for the law and willingness to engage in violence warrants a serious sentence. The crimes Martin committed on January 6 are consistent with his

past acts. He has demonstrated that, when he does not like something or disagrees with someone, he is willing to engage in violence. Martin's previous convictions and behavior on January 6 establish that he continues to engage in violent behavior and increases the likelihood that he will engage in criminal conduct again.

Martin's willingness to lie to get out of trouble also warrants a serious sentence. Shortly after his arrest, Martin was caught on a recorded jail call where he instructed his current fiancée to lie to authorities and tell them that the firearms seized from his residence belonged to her and her father and that he did not know about them[8]. Martin continued to lie. In this case, Martin's false trial testimony showed that he was willing to lie under oath to get out of trouble.

The need for specific deterrence is especially strong here. Unhappy with the results of the 2020 presidential election, Martin traveled thousands of miles from his home in California to Washington, D.C., joined a mob invading the Capitol, obstructed Congressional proceedings, and attacked officers. The Court must sentence Martin in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying

---

[8] On November 25, 2024, Martin received an enhancement to his sentence for this witness tampering.

with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own

set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[9]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[10] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Henry Muntzer*, 21-cr-105 (JMC) the court sentenced Muntzer to 24 months' imprisonment after being convicted of 18 U.S.C. § 231(a)(3) and 18 U.S.C. § 1512(c). The government dismissed the 18 U.S.C. § 1512(c) count prior to sentencing. Muntzer traveled from Montana to D.C. to attend the Stop the Steal rally before approaching the Capitol. He entered

---

[9] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[10] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

the building through the Upper West Terrace Doors and proceeded through the Rotunda to a hallway just outside the Old Senate Chamber, where he engaged in collective pushing against a police line. He then returned to the Rotunda, where he again joined the mob in pushing against police guarding the stairway down to the Upper West Terrace. As the police formed a line in the Rotunda and tried to push rioters out, Muntzer continued to resist and was ultimately one of the very last rioters pushed out of the Rotunda. At trial, Muntzer, like Martin, took the stand and repeatedly perjured himself and also reiterated his lack of regret for his actions. He continued to make public statements, like Martin, up until sentencing pushing "fedsurrection" theories and indicating that he had no remorse for his actions. Muntzer had no criminal history compared to Martin's significant violent criminal history, which warrants a higher sentence.

In *United States v. Dunfee*, 23-CR-36-RBW, the court sentenced a defendant on a § 231 conviction and a misdemeanor, after his § 1512(c)(2) conviction was dismissed in light of *Fischer*. Dunfee encouraged the crowd to "Rise Up!", declared his intention to "take [the Capitol]", and threatened police officers protecting the Capitol building that "We want Donald Trump, and if Donald Trump is not coming, we are taking our house!" Similar to Martin repeatedly attempting to open the North doors to prevent officers from being able to secure the Capitol building, Dunfee led rioters in a collective push against the barricades that marked the restricted perimeter on the East Front. As Dunfee pushed against the barricades, he warned police officers that they would have to "fight" the crowd. Martin made similar comments begging officers to "join us" and to "do the right thing and let us in." At 2:00 p.m., Dunfee and other rioters overwhelmed and overran the police line and advanced to the Capitol building. Dunfee was unable to get into the building because the Rotunda Doors were locked, and he was forced to retreat due to police action.

However, he stayed close by to congratulate other rioters on shutting down the certification, proclaiming, "Hallelujah . . . Mission accomplished". Martin also congratulated other rioter's obstructive conduct, including praising another rioter for using his flag to keep the North doors open as officers attempted to secure the building. The court found an upward departure was warranted under U.S.S.G. § 5K2.7, because Dunfee's actions contributed to and resulted in a significant disruption of the certification of the electoral college vote. From a guidelines range of 18-24 months, the court sentenced Dunfee to 30 months of imprisonment.

The goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## VIII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose

restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But because Martin was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes,

the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[11]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

---

[11] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

More specifically, the Court should require Martin to pay $2,000 in restitution for his conviction on Count One. This amount fairly reflects Martin's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 30 months of incarceration, 36 months of supervised release, $2,000 in restitution, a mandatory assessment of $100 for Counts One, a mandatory assessment of $25 each for Counts Three and Four, and a mandatory assessment of $10 each for Counts Five and Six.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:    */s/ Taylor L. Fontan*
TAYLOR L. FONTAN
IN Bar No. 35690-53
Assistant United States Attorney
District of Columbia
601 D St. NW
Washington, DC 20530
(202) 815-8597
Taylor.Fontan@usdoj.gov