## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-cr-562-RC** |
| | : | |
| **BENJAMIN MARTIN,** | : | |
| | : | |
| **Defendant.** | : | |

## MR. MARTIN'S SENTENCING MEMORANDUM

Mr. Martin respectfully submits that a sentence of 12 months and one day of custody concurrent to the sentence he received in case # 1:21cr228-JLT-BAM for being a prohibited person in possession of firearms is sufficient but not greater than necessary to effectuate the purposes of § 3553. His positive societal contributions while overcoming adversity mitigate the jury's finding that he broke the law. His conduct prior to and at the Capitol Building demonstrates that he poses a minimal future threat to law and order. The significant collateral consequences that he has suffered – a social death punctuated by loss of friends, family, and profession since his September 2021 arrest – constitute a form of punishment that is far more severe than a custodial sentence. His more than three years of exemplary conduct while on bond demonstrate that less is needed to justly punish, deter, and protect the public. Finally, section 5G1.3(d) strongly suggests that Mr. Martin should receive an entirely concurrent sentence in order to prevent unwarranted disparity between defendants sentenced in two districts for two unrelated offenses and defendants sentenced for multiple unrelated offenses in one district. Section 5G1.3 note 4(A) advises the Court when considering whether to impose consecutive or concurrent sentences the need to "avoid unwarranted disparity."

**I.**

## MR. MARTIN IS A MAN OF UNCONDITIONAL LOVE, FAMILY, COMMUNITY, FAITH, AND PERSERVERENCE.

Mr. Martin was born with physical and mental challenges that led to severe bullying. He was diagnosed with ADHD, had a form of dysgraphia,[1] and was legally blind. Exhibit A, *Character Letters*[2] at 20; *see also* PSR 105, 109. He had challenges with reading something and then reproducing it in written form. Exh. A at 20. There was concern that he would never be able to finish reading a book. *Id*. A child psychologist diagnosed Mr. Martin with "minimal brain dysfunction." *Id*. at 14; PSR 110. He was held back in the second grade and did not attend the sixth grade at all. *See* PSR 94. He was briefly medicated for the ADHD but that was discontinued because it caused him to become even more hyper. *See* PSR 109; *see also* Exh. A at 14, 20 (medication was not helpful). He was placed on the bus for kids with learning disorders; teachers physically and emotionally abused him (including a teacher who slammed his head against a metal pole), and he was ridiculed by his classmates. PSR 94; Exh. A at 20, 28; *see also* Exh. A at 2 ("school was not a particularly safe place for Benjamin").

Mr. Martin was raised in poverty. His parents cleaned homes when they arrived in Fresno, California. Exh. A at 17. His mother competed with his Aunt Kelly to see who could make the most meals out of one chicken for their families – the record being Mr. Martin's

---

[1] Dysgraphia is a neurological condition that impairs an individual's writing abilities, affecting both the physical act of writing and the ability to express thoughts in written form. It is considered a specific learning disorder in written expression and can manifest through difficulties with handwriting, spelling, and organizing written language. Dysgraphia can be developmental, appearing as children learn to write, or acquired due to brain trauma. It is not related to a person's intelligence level and can be managed with appropriate interventions and strategies. https://www.healthline.com/health/what-is-dysgraphia (accessed November 18, 2024).

[2] Twenty character letters are attached. Mr. Martin is fortunate to enjoy significant love and support. In case the Court is unable to read all the letters, he has done his best to distill the main themes of the letters in this section of his Memorandum. He also places the letters he believes are more relevant and impactful at the front of Exhibit A.

mother making four meals feeding a family of six for four nights. *Id*. His family picked fruits and vegetables at the local produce farms. *Id*. His Aunt Kelly writes how both her and Mr. Martin's families experienced "very hard times financially." *Id*.; *see also id.* at 28 (making ends meet a struggle; family was impoverished).

Mr. Martin was molested by three different perpetrators as a child and teenager. His babysitter sexually abused him. PSR 96. A guitar teacher molested Mr. Martin for two to three years. PSR 95-96. Mr. Martin blamed himself for what happened. 1:21cr228-JLT-BAM,[3] ECF no. 117 (PSR) at 56. He dealt with shame, embarrassment, resentment, and anger for decades. *Id*. Finally, Ms. Gray reported that a third individual sexually abused Mr. Martin but she could not recall their name. PSR 96.

Mr. Martin was able to overcome adversity with the love of his family and faith. His parents were "loving, supportive, and very religious." PSR 93, 99. His father has been a minister for nearly 50 years. Exh. A at 14; *see* PSR 90-91. His mother's work ethic is what drove their family's real estate company to what it is today -- 105 agents and seven employees. PSR 91; Exh. A at 2. She writes, "I am a worker. I believe that work gives a person purpose and that we should use our gifts, skills, talents, and tools for the benefit or our families and communities." Exh. A at 2. Mr. Martin's family is massive and unified. For example, His 93-year-old maternal grandmother has 12 grandchildren, 29 great grandchildren, and all her great grandchildren are still living in the Fresno area. *Id*. at 29-30. They were raised to love Jesus and the United States. *Id*. at 30. When Mr. Martin struggled in school, people like his sister helped him with eye

---

[3] Mr. Martin's case # in the Eastern District of California. All references to the PSR in that case will begin with a reference to the case number.

exercises. *Id*. at 20. His parents used cognitive behavioral techniques to help him in the home and school. *Id*. at 14. And his family welcomed others who had no family into their homes. *Id*. at 2. The family motto is "there is always room for one more." *Id*. Mr. Martin's older brother (Jared) writes, "I think describing our early life as growing up in the lower middle class is generous. Saying that, we are relationship billionaires." *Id*. at 30.   Mr. Martin's family and their values are significant reasons why he was able to graduate from college and obtain his real estate broker's license. *See* PSR 116-18.

Mr. Martin has practiced unconditional love throughout his adult life, especially when it comes to his family. If there is one letter for the Court to read, it is that written by Mr. Martin's oldest son, Brennan. *Id*. at 4-8. Mr. Martin fought for years to reunite with Brennan after he was adopted without Mr. Martin's consent. *Id*.; PSR 60. Brennan writes, "[M]y father has consistently shown up all throughout my life. My dad taught me how to love myself and others through amazing words and acts of kindness, and has been one of the main contributors to my success in life." *Id*. at 4. Emma, Mr. Martin's daughter, describes Mr. Martin as her "best friend." *Id*. at 9. He supported her through suicidal periods and the shame that she felt for her sexual identity, amongst other things, by teaching her the power of affirmations to boost her self-confidence. *Id*. Despite coming from a very religious family, he accepted her and her female partners in their home. *Id*. Mr. Gray's daughter, K.G., describes Mr. Martin as "the kindest, most caring, and compassionate person I have ever met…[h]e has always been my biggest supporter." *Id*. at 13. He attends her meets, academic assemblies, and listens to her talk for hours. *Id*. Mr. Martin cares for his 93-year-old grandmother when his parents go out of town. *Id*. at 19. He prepares her meals/vitamins and sits with her to talk. *Id*. Leslie Maldonado, Mr. Martin's

4

younger cousin, explains in detail how Mr. Martin took his time to show her that she was loved

while she dealt with growing up in a broken home. *Id*. at 22. He was the first person that called

her to offer his support when she became pregnant out of wedlock at 21 years old. *Id*. The

voicemail is still on her phone today. *Id*.

Mr. Martin's care for others extends far beyond his family. As a youth, he defended other

students that were bullied in school. *Id*. at 18. He befriended his neighbors, including an older

Armenian man with whom he shared a bond over magnets. *Id*. at 2. Mr. Martin convinced his

mother to buy a less fortunate family a Christmas tree and gifts when he was in junior high

school, even when his own family struggled with the basics. *Id*. Emma's friend, Ciena, describes

Mr. Martin as a father figure. *Id*. at 24. He helps with his elderly neighbors and drops off eggs

and vegetables to another neighbor, Mr. Bennett. *Id*. at 26, 39.   He was previously on the board

of the Fresno chapter of the Make-a-Wish Foundation. PSR 103.

Mr. Martin has strived to be a leader and uplift people at work. He helped Kaylee

Schwemley and others reach their full potential at Keller Williams. *Id*. at 33. He met with 20-25

agents daily to hone their work skills. *Id*.   He started an internship program for high school

students interested in real estate. *Id*. Gene O'Brien writes, " [M]y son trained with Ben while

Ben was growing his team and to this day my son always says Ben Martin worked so hard to

make sure he did the job to the best of his ability…Out of all the agents I worked with in my 28

years of lending, none focused on their fiduciary responsibilities to Buyers and Sellers like Ben

Martin and his family." *Id*. at 34.

Mr. Martin's world came crashing down due to his political protests related to COVID,

his participation in the January 6, 2021 events at the Capitol Building, and the seizure of guns at

his home during the execution of the search warrant in this case. Mr. Martin went from regularly being in the top 1-2% of real estate brokers in the Fresno area to last selling real estate in 2021. PSR, 121-22; *see also* Exh A. at 33-34, 36 (discussing Mr. Martin's acumen and leadership for real estate). His family's business suffered tremendously from cancel culture for Mr. Martin's political beliefs/organizing and they eventually asked him to leave Keller Williams. *See e.g.,* Exh. A. at 15. He has been unable to get hired by another brokerage and customers do not want to list with him for fear of being targeted. PSR 122. Attorney Shannon B. Jones[4] represented Mr. Martin before the California Department of Real Estate in 2019 wherein he admitted to failing to report his 2019 domestic violence conviction. *See* PSR 118. She has represented close to 80,000 real estate agents and numerous brokerages for 34 years. Defense counsel spoke with her recently, and she said that based upon what she knows about Mr. Martin's current federal criminal cases, she believes that it is "highly unlikely" that he will be able to keep his broker's license. According to Ms. Gray, "the instant offense has 'ruined' [Mr. Martin's] real estate career." PSR 102.

Mr. Martin is fighting to preserve just like he always has. He describes the court proceedings since his 2021 arrest as "the most humbling experience I have ever gone through." 1:21cr228-JLT-BAM, ECF no. 117 (PSR) at 21. He wants to live a more private life. *Id*. at 64. He has "mellowed," become softer, and matured. Exh. A. at 22. He is retrospective and focused on rebuilding economically to support his family. *Id*. at 26. To that end, Mr. Martin had the idea for a small family business growing microgreens and gourmet mushrooms. *See e.g., id*. at 8; PSR

---

[4] http://calrealestatelaw.com/Shannon-B-Jones (accessed November 20, 2024).

124. Lovely Grown Farms[5] was started in roughly April 2023 and provides its produce to many of the local restaurants. PSR 124; Exh. A at 3. Mr. Martin is the farmhand and sole employee of the business. He grows, packages and sells the produce. He manages relationships with suppliers, vendors and customers. He is responsible for bills receivable and payable. He devotes 40+ hours per week, seven days per week to the business. He is training his son to take over his role for when he goes into custody. *See* Exh. A at 8 (Brennan describing working with father on farm). Many of the letter writers share the sentiments of Mr. Martin's neighbor, Allen Bennet, when he says "I believe he [Mr. Martin] understands the need to move forward with his life and hopes to become a better person when all this is behind him. In my opinion, Ben is an asset to our community and to our neighborhood as well as to his family. The sooner he can return to them and move on with his life the better we will all be." *Id.* at 27.

Mr. Martin has overcome adversity to make significant positive contributions to society. A harsh sentence is not needed to justly punish, deter, or protect the public when balancing the jury's verdict with Mr. Martin's commitment to hard work, family, and community.

## II.

## MR. MARTIN'S CONDUCT PRIOR TO AND AT THE CAPITOL BUILDING DEMONSTARTE THAT HE IS A MINIMAL THREAT TO SOCIETY.

Mr. Martin did not travel to Washington D.C. intending to storm the Capitol. He went with his elderly father as a bonding experience and to support Donald Trump. Despite his heavy online presence wherein he was vocal of election fraud, he never mentioned marching on the Capitol prior to arriving to Washington D.C. Even though he was part of chat groups with others that called for being armed and violence in Washington D.C., Mr. Martin's activity in those chats

---

[5] https://lovelygrown.com/home (accessed November 20, 2024).

was minimal and he personally did not call for nor endorse such conduct.

Mr. Martin did not immediately head over to the Capitol Building despite hearing Trump call for his followers to march there in the middle of his speech. He was not part of the group that breached the outer barricades around 1 p.m. shortly before Trump ended his speech. He did not march directly to the Capitol Building immediately after Trump again directed his followers to march there. Instead, Mr. Martin left the speech with his father shortly before it ended and returned to his hotel. He then took a nap for roughly 45 minutes while many of Trump's supporters had now breached the interior of the Capitol Building. Mr. Martin's actions are not emblematic of someone who was rabid to overthrow our government or do harm.

Putting Mr. Martin in the Court's position and accepting the jury's verdict as true, the evidence shows that after Mr. Martin arrived at the Capitol Building around 3 p.m., he was overtaken by the "mob mentality" that pervaded the atmosphere that day. There were roughly 50,000 civilians already present, many of whom were in the building. They were yelling, chanting, and literally scaling the walls. Some carried weapons, tactical gear, gas masks, and chemical irritants. In contrast, Mr. Martin went to the Capitol Building unarmed and in street clothes.[6] He was someone who had strong, outspoken views about the election being stolen and he observed others who shared that view fighting to be heard, seen, and validated. Yet he did not immediately barge into the building. He requested to be let in three times. He spoke to officers in a respectful manner and cared about following the law – "are you going to arrest if we go in?" "Do the right thing," and "we'd like to be let in today, sir" were some of the things that he told officers. The lines between "wrong" and "right" were blurred that day - he was told by a civilian that had just freely exited the north door along with numerous others that officers were helping them make their way into the building. Against this backdrop, Mr. Martin walked into the

---

[6] Note that Mr. Martin's guidelines would be the same if he had brought a firearm, since § 2B2.3 strangely adds only adds +2 levels for carrying a firearm while trespassing inside the U.S. Capitol, but Mr. Martin receives a higher offense level +4 due to the § 2B2.3 cross reference based on a trespass with intent to commit a civil disorder.

building himself without receiving permission. He made it no more than 15 feet into the building. He can be seen on video calmly talking to officers in contrast to others who are flipping them off, riling up the crowd, and assaulting officers. He was pushed out after just two minutes and did not re-enter. He held onto an outer door for roughly 30 seconds while officers tried to close it amidst chaos - civilians and officers pushing one another, people in danger of being trampled, yelling, an alarm blaring, chemical irritants, and Mr. Martin being hit in the head with a flying chair. He opened the right outer door from the inside after others had ripped open the left door. He stayed for roughly an hour at the north door continuing to push to be let in. But he was not violent and did not destroy property. He did not attempt to hurt officers. He continued to engage in dialogue with them asserting his view that the election had been stolen but he did so respectfully – he tried to convince them to walk off the job instead of forcefully overtake them. At one point, he told officers that he loved them. The jury found that Mr. Martin violated the law, but he is nowhere near the most egregious January 6 actors.

     Mr. Martin's lack of preparation to "storm" the Capitol; his late arrival; the manner with which he spoke to officers; his brief period of time actually in the building; and his non-violent behavior all show that a substantial sentence is not necessary to justly punish, deter, and protect the public from Mr. Martin ever doing something like this again.

### III.

### THE COURT SHOULD CONSIDER THE COLLATERAL CONSEQUNCES SUFFERED BY MR. MARTIN IN DETERMINING WHAT IS JUST PUNISHMENT.

     Professor Michelle Alexander has explained, "[m]yriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of 'civi[l] death' and send the unequivocal message that they are no longer part of us." Michelle Alexander, *The New Jim Crow* at 142 (2010). Mr. Martin has all but lost his ability to practice as a real estate broker with

over two decades of experience. In fact, he has let his license expire rather than pay the renewal fees only to have it taken away at a later date. He has gone from being a top real estate agent to someone working for room and board as a microgreens farmer. Ms. Jones confirms that it will be "highly unlikely" that Mr. Martin will keep his real estate license. Additionally, Mr. Martin and Ms. Gray have lost family and friends. Ms. Gray writes, "I pray that, when considering sentencing, you take into account the immense price already paid – the social death he has endured." Custody is difficult but losing one's ability to support themselves in the field that they have dedicated their life to, especially when they had done so in such a lucrative fashion, is a punishment that is crippling and forever. Losing loved ones is painful. Being stripped of the fundamental aspects of life that define someone's self-worth (profession, community) at nearly 50 years old is devastating. Mr. Martin will live with these consequences for the rest of his life. Piling more custody onto an already broken man will not advance societal interests.

## IV.

## MR. MARTIN'S CONDUCT ON BOND SUPPORTS A MITIGATED SENTENCE.

Mr. Martin has been fully compliant throughout the three-year period that he has been on pre-trial release. PSR 8-11. His conduct on bond shows that a lesser sentence is sufficient to promote respect for the law, adequately deter, and protect the public.

## V. THE ENHANCEMENT FOR SEPARATE GROUPS OF RELATED CONDUCT CREATES UNWARRANTED DISPARITY ANF EXCESSIVELY PUNISHES EXERCISE OF A RIGHT TO JURY TRIAL

If the Court overrules Mr. Martin's objection to the guideline calculation which divides Mr. Martin's conduct at the Capitol into two groups, the Court should consider whether this +2 level grouping enhancement will create unwarranted disparity with defendants who committed

similar offenses but pled guilty.   The Pre-sentence Report's recommendation that Mr. Martin'

offense level be calculated based on two separate groups of offenses results in a massive increase

in his sentencing guidelines.   If his offenses that day are treated as two groups under § 2A2.4 his

final guidelines are18-24 months, but if the offenses are treated as one group his imprisonment

range is from 6-18 months, since it is a Zone C sentence eligible for 50% split sentencing. PSR

para. 52-71.   This +2 grouping enhancement in Mr. Martin's case results in a tripling of the

minimum period of guideline imprisonment, but only applies if a defendant is convicted of 18

U.S.C. § 231 and the misdemeanors under 18 U.S.C. § 1752. PSR para. 44.   This enhancement

applies even though the probation officer determined that the §1752 misdemeanor offenses were

committed for the purpose of committing a felony civil disorder. See PSR para. 44. This tripling

of the guideline minimum as a result of committing misdemeanors in furtherance of a federal

felony is unheard of in the sentencing guidelines and conflicts with the stated purpose of the

Sentencing Guidelines to create a system of "Real Offense" sentencing versus "Charge Offense

Sentencing."   As the Commission explains in the Guideline Manual, " The Commission has

written its rules for the treatment of multicount convictions with an eye toward eliminating unfair

treatment that might flow from count manipulation." U.S. Sentencing Guideline Manual Ch. 1 pt

A page 6.    The Commission further explains that "The guidelines have been written in order to

minimize the possibility that an arbitrary casting of a single transaction into several counts will

produce a longer sentence…. In addition, the sentencing court will have adequate power to

prevent such a result through departures." U.S. S.G.   Ch. 1 Pt. A page 10.

      An example of the charge disparity is the case of U.S. v. Gordon, where this court

imposed only six months prison on a defendant for a conviction of 18 U.S.C. § 231 which was

committed at the same North door where Mr. Martin's §231 was committed at the same time. See 1:22-CR--343-RC ECF 26 Factual basis.   Mr. Gordon, who had a long violent criminal history, was not charged with the misdemeanors which he clearly committed, because he pled to an information, but his conduct was clearly more egregious as he threw heavy projectiles at the doors. 1:22-cr-343-RC ECF 34 Govt Sent. Memo. At p. 12.   Mr. Gordon was facing an offense level of 13, because he used a deadly weapon (a rock) in furtherance of the § 231 offense, but receive a mere 6 months sentence although his criminal history included several convictions for domestic assault and felon in possession of a firearm.

The massive disparity between Mr. Gordon's sentence and the recommended sentence for Mr. Martin suggests that the primary reason for the different sentences is Mr. Martin's decision to exercise his right to a jury trial.   The Supreme Court and appellate courts have long held, "the constitutional rights of the appellants have been infringed" if "more severe sentences were imposed upon them because they exercised their right to stand trial." *United States v. Capriola*, 537 F.2d 319, 320 (9th Cir. 1976). *See also North Carolina v. Pearce*, 395 U.S. 711, 725 (1969), overruled on other grounds, *Alabama v. Smith*, 490 U.S. 794 (1989); *Robtoy v. Kincheloe*, 871 F.2d 1478, 1480 (9th Cir. 1989) (*citing United States v. Jackson*, 390 U.S. 570 (1968)); *United States v. Carter*, 804 F.2d 508, 513 (9th Cir. 1986); *United States v. Stockwell*, 472 F.2d 1186, 1187 (9th Cir. 1973).

Congress did not include a defendant's decision to exercise trial rights as a sentencing factor in 18 U.S.C. § 3553(a), and it is error to consider a factor which is not included in §3553 in determining a sentence. *Tapia v. United States*, 131 S. Ct. 2382 (2011)(holding it is error to consider a factor that was not on the statutory list of sentencing factors).   For these reasons, "[i]t

is well settled that an accused may not be subjected to more severe punishment simply because he exercised his right to stand trial." *United States v. Medina-Cervantes*, 690 F.2d 715, 716 (9th Cir. 1982) (*citing Capriola*, 537 F.2d at 321; *Stockwell*, 472 F.2d at 1187). Sentencing courts "must not use the sentencing power as a carrot and stick to clear congested calendars, and they must not create an appearance of such a practice." *Id*. at 716.

The U.S. Sentencing Guidelines §3E1.1 recommends a moderate two-level reduction for acceptance of responsibility, which is normally applied to defendants who plead guilty. U.S.S.G. §3E1.1 cmt. 3. However, the disparity between Mr. Martin and Mr. Gordon who committed the same 18 U.S.C. § 231 violations at the same time in the same place depends largely on the fact that Mr. Gordon was allowed to charge bargain to avoid +2 enhancement for a conviction for trespass for the purpose of violating 18 U.S.C. § 231. This charge bargaining disparity is unwarranted under § 3553, because it gave Mr. Gordon -4 levels for pleading guilty and if Mr. Martin is sentenced to 18 months or more in prison it will create the appearance of vindictive sentencing in violation of *North Carolina v. Pearce, supra*.

Mr. Martin's decision to go to trial cannot be extricated from the fact that he chose to go to trial primarily because he was facing the legally invalid charge for obstructing the certification of the election in alleged violation of 18 U.S.C. § 1512. At the time he decided to go to trial, the most serious charge was the now invalid § 1512 charge which usually carried a punishment of several years of imprisonment. Since the Government incorrectly believed it had sufficient evidence to convict Mr. Martin for the § 1512 crime, he was not offered a plea deal to just the 18 U.S.C. § 231 charge that Mr. Gordon received. The fact that the Government and the D.C. Circuit misunderstood the elements of 18 U.S.C. § 1512 does not justify the massive disparity between

13

the plea offers made to Mr. Gordon and Mr. Martin.   Note than any plea bargaining offered to

Mr. Martin would have required him to waive appeal of issues which were ultimately affirmed

by the Supreme Court.


## VI.

### THE COURT SHOULD IMPOSE A FULLY CONCURRENT SENTENCE TO AVOID AN ARBITRARY RESULT DICTATED BY THE IRRELEVANT FACT THAT MR. MARTIN RESIDES OUTSIDE OF THE DISTRICT OF COLUMBIA.

A sentence may be imposed consecutively, partially concurrently, or concurrently to an

undischarged federal sentence to achieve reasonable punishment for the instant offense. *See*

U.S.S.G. § 5G1.3 n.4.

> In order to achieve a reasonable incremental punishment for the instant offense and avoid unwarranted disparity, the court should consider the following:
>
> (i)     the factors set forth in 18 U.S.C. § 3584 (referencing 18 U.S.C. § 3553(a));
> (ii)    the type (e.g., determinate, indeterminate/parolable) and length of the prior undischarged sentence;
> (iii)   the time served on the undischarged sentence and the time likely to be served before release;
> (iv)    the fact that the prior undischarged sentence may have been imposed in state court rather than federal court, or at a different time before the same or different federal court; and
> (iv)    any other circumstance relevant to the determination of an appropriate sentence for the instant offense.

U.S.S.G. § 5G1.3, n. 4(A).

Here, factor (iv) weighs heavily in favor of fully concurrent sentence because Mr.

Martin's Guidelines exposure has been artificially inflated for living outside of the District of

Columbia. Had Mr. Martin lived in the instant district, he would have been charged in the same

indictment, or at least sentenced at the same time, on violations of § 922 and the January 6

14

related crimes. The FBI found the firearms in a locked safe while executing a search warrant for Mr. Martin's home in connection with the instant case. PSR 79. He was arrested on both cases on the same day. *Id*.

If Mr. Martin were charged for both sets of crimes in the same district, the multiple counts rules in §§ 3D1.1-3D1.4 would have applied and his § 922 Guidelines range would have subsumed the January 6 related crimes' range. The EDCA Court found Mr. Martin's Guidelines to be the following: BOL 20, +4 (8-24 guns), +2 (obstruction of justice), -2 (acceptance of responsibility)[7] for a total OL 24, CHC II, 57-71 months. 2 It imposed 38-month of custody followed by two years of supervised release. *U.S. v. Martin*, 1:21-cr-00228-JLT 11/25/24 transcripts ECF 129 at 34. In the instant case, Mr. Martin's worst-case Guidelines calculations are as follows: Group 1: BOL 10, +2 (obstruction of justice); Group 2: BOL 10, +2 (obstruction of justice); total OL 14, CHC III,[8] 21-27 months.[9] PSR 52-71; *cf*. 80-82. Had Mr. Martin been charged for all crimes in the District of Columbia, Groups 1 and 2 would be disregarded because they are both more than 9 levels less serious than the group with the highest offense level.[10] *See* U.S.S.G. § 3D1.4(c). However, Mr. Martin is arbitrarily facing the prospect of consecutive sentences with a total range of 78-98[11] months solely because he lives in California and not Washington D.C.

There are several specific examples of cases where January 6th defendants were able to receive entirely concurrent sentences for January 6th conduct and illegal weapon possession.   In

---

[7] Mr. Martin had a stipulated facts bench trial wherein he stipulated to all the essential elements of § 922. He presented no exculpatory evidence.

[8] Mr. Martin's CHC now becomes III because of the sentence he received in the EDCA.

[9] This is the position of U.S. Probation. Mr. Martin argues that he has a total OL 10, CHC III, 10-16 months.

[10] Section 922 Group (OL 24) versus Group 1 (OL 12) versus Group 2 (OL 12).

[11] 57 + 21 = 78. 71 + 27 = 98.

*United States v. Lonnie Coffman*, 1:21-cr-004 and 1:21-cr-614, Mr. Coffman, a member of an armed militia group, was charged in D.C. with possession of unregistered explosives in violation of 28 U.S.C. § 5845 (Molotov cocktails) and carrying an unlicensed pistol on January 6th and possessing more unregistered explosives and as assault rifle in Alabama in the same investigation.   Mr. Coffman was permitted to transfer his Alabama case to D.C. and received concurrent guideline sentences of 46 months prison in both cases. See 1:21-cr-0004 CKK at ECF 614.

In *United States v. Reffit*, the defendant was convicted of threating Jan 6 witnesses in Texas with being "shot" for snitching and for possessing a firearm during a civil disorder on January 6th in violation of 18 U.S.C. § 231, entering the Capitol with a deadly weapon.   Judge Friedrich held that his correct sentencing guideline range for all this conduct would be only 41-51 months.   Reffit originally received a concurrent sentence for the unrelated offense of possessing an AK-47 firearm in a parking lot near the U.S. Capitol in violation of D.C. Code. See *United States v. Reffit*, 2024 WL 1577941 (D.D.C. April 10, 2024), see also *U.S. v. Reffit, Government Sentencing Memorandum.* 2022 WL 2828742 (D.D.C.)   The Reffit case shows that even though Mr. Reffit possessed an unregistered silencer in Texas and threatened January 6th witnesses in Texas, and carried a different firearm from Texas to D.C. on January 6th, his guidelines sentence range was only 41-51 months for all conduct. This range is lower than Mr. Martin's total sentence if he receives a consecutive sentence in this D.C. case.   Even where defendants were sentenced consecutively the combined sentences have been much lower.

In the case of *United States v. Cleveland Grover Meredith*, 1:21-cr-00159-ABJ, the defendant received a sentence of 28 months prison for making threats to kill Nancy Polosi and

possessing firearms and ammunition without registration in D.C. (an assault rifle and 2,500 rounds of ammunition with high-capacity magazines). See *Meredith, Govt. Sent Memo* ECF 54. Based on the sentencing memorandum this 28-months sentence seems to be a downward variance from the 37-46 months range based on mental health issues. ECF 56 at 9.

In *United States v. Mazza*, the defendant received 60 months prison for participating in the January 6th disorderly conduct by assaulting an officer with a police baton while Mr. Mazza was armed with a pistol he had brought from Indiana in violation of D.C. firearms law. *See Mazza Govt Sentencing Memorandum* ECF 30 at 2-3. In *Mazza*, the guidelines for his D.C. Code felony were 9-24 months prison, and 57-71 months for the federal offenses. The Government argued for consecutive mid-range sentences of 66 months and 12 months, but the Court imposed a 60-month sentence on 18 U.S.C. § 111 and a concurrent sentence for carrying a pistol without a license. 1:21-cr-00736-JEB ECF 41 p. 2.

There are no § 3553(a) factors that justify Mr. Martin receiving a higher sentence than a hypothetical Washington D.C. resident who had guns unlawfully stored in their homes while they participated in the January 6 events at the Capitol Building. *See* U.S.S.G. § 5G1.3, n. 4(A)(i). In fact, a Washington D.C. resident would have arguably presented a greater risk to the public because of easy access to their firearms while the events at the Capitol Building were escalating. Meanwhile, Mr. Martin had no access to his firearms on January 6 because they were stored thousands of miles away.   The fact that several January 6 defendants received concurrent sentences for illegal firearms offenses suggests that consecutive sentencing would create unwarranted disparity.

Finally, where "a term of imprisonment resulted from another offense that is relevant

17

conduct to the instant offense of conviction . . . . the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment." U.S.S.G. § 5G1.3(b).   The EDCA offense of possessing firearms was ongoing on January 6, although the firearms were not seized until later.   *See* EDCA PSR ¶¶ 6, 9 (recounting that Mr. Martin's safe was searched in September 2021 and there were records of the firearms being purchased by Mr. Martin in 2009 and 2013).   The EDCA offense is therefore relevant conduct to the instant offense.   *See* U.S.S.G § 1B1.3(a)(1) (including in relevant conduct "all acts and omissions committed . . . by the defendant . . . that occurred during the commission of the [instant] offense of conviction).   Therefore, the guidelines direct that the two sentences "shall" be run concurrently.   U.S.S.G. § 5G1.3(b).

In conclusion, U.S.S.G. § 5G1.3(b) and all the factors in application note 4(A) weigh in favor of a fully concurrent sentence and the Court should impose the instant sentence accordingly.

## VII.

## <u>MR. MARTIN REQUESTS A SELF SURRENDER DATE OF JANUARY 22, 2025.</u>

He concurs with U.S. Probation's recommendation that he is a good candidate for voluntary surrender. ECF no. 108 at 3. Defense counsel reached out to Officer Frank Guerrero, who directly supervises Mr. Martin. As of Monday, November 18, 2024, Officer Guerrero confirmed that Mr. Martin continues to comply with supervision. Officer Guerrero does not object to a self-surrender date. Finally, Mr. Martin respectfully asks the Court for the opportunity to spend the holidays with his family and to wrap-up his affairs before serving time in prison. The EDCA ordered a self-surrender date of no later than January 22, 2025 at noon. Mr. Martin

recommends that same date here.

## VIII.

## <u>CONCLUSION</u>

For the forgoing reason, the Court should sentence Mr. Martin to 12 months and 1 day of custody concurrent to the sentence imposed in his Eastern District of California case.

Respectfully submitted,

HEATHER E. WILLIAMS
Federal Defender
Eastern District of California
CA Bar Number 122664

Date: December 6, 2024          By:        */s/ Hootan Baigmohammadi*
HOOTAN BAIGMOHAMMADI
CA Bar Number 279105
DOUGLAS BEEVERS
Assistant Federal Defenders
Eastern District of California
801 I Street, 3rd Floor
Sacramento, CA 95814
T: (916) 498-5700
F: (916) 498-5710
Hootan_baigmohammadi@fd.org
Douglas_beevers@fd.org